SRS TECHNOLOGIES, Plaintiff,

v.

UNITED STATES of America, Erskine Bowles, Administrator, Small Business Administration, and Les Aspin, Secretary, Department of Defense, Defendants,

Science & Technology, Inc., Intervenor.

Civ. A. No. 93–22148(RCL).

United States District Court,
D. Columbia.

Jan. 27, 1994.

Alan Grayson, Falls Church, VA, for plaintiff.

Robert Lawrence Shapiro, Asst. U.S. Atty., Washington, DC, for defendants.

Jack B. Gordon, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for intervenor.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on the parties' cross-motions for summary judgment, intervenor's motion to intervene and for dismissal or summary judgment, plaintiff's second motion for a preliminary injunction, plaintiff's motion for leave to file a supplemental complaint, intervenor's motion to dissolve the preliminary injunction this court granted on November 10, 1993, and plaintiff's motion for an extension of time to file its opposition to defendants' motion to dismiss or for summary judgment.

This court shall grant in part and deny in part plaintiff's and defendants' motions for summary judgment, grant intervenor's motion to intervene, and deny intervenor's motion for dismissal or summary judgment. Further, this court shall deny plaintiff's second motion for a preliminary injunction, plaintiff's motion for leave to file a supplemental complaint, and intervenor's motion to dissolve the original preliminary injunction. This court shall grant, *nunc pro tunc,* plaintiff's motion for an extension of time to file its opposition to defendants' motion for dismissal or summary judgment.

## I. FACTS

Plaintiff SRS Technologies ("SRS") has participated in the Small Disadvantaged Business program ("SBD") of the Small Business Administration ("SBA") since the program's inception. To qualify under the regulations of that program, companies must (among other things) be owned and controlled by individuals who are socially and economically disadvantaged. 13 C.F.R. § 124.602(1) (1992). SRS is owned and controlled by Mr. Mohindar S. Sandhu, a businessman who claims that he is socially and economically disadvantaged.

SRS submitted a proposal to the Department of Defense ("DOD") in response to DOD's Request for Proposals ("RFP") No. DAAH01–93–R–R010. At stake was an SDB set-aside contract, the 1993 Technical Data Management Support Services contract. On July 23, 1993, DOD notified SRS that it was the apparent successful offeror of that contract.

Seven days later, Science & Technology, Inc. ("SCITEK"), intervenor in this case, filed a protest challenging SRS's SDB status. The SBA received SCITEK's protest on August 2, 1993. Because initial SBA SDB decisions are due fifteen working days after the receipt of an SDB protest (48 C.F.R. § 210.-302–70(g)), the SBA's initial decision on SCITEK's protest was due on August 23, 1993. Yet it was not until September 3, 1993, that the SBA's Director of the Division of Program Certification and Eligibility found that SRS was not an SDB after all. SRS thereafter filed an administrative appeal of this decision on September 21, 1993, and the decision was finally upheld by the SBA Associate Administrator for Minority Small Business and Capital Ownership Development on September 30, 1993.

In the meantime, however, DOD had *awarded* the contract at issue to SRS on August 26, 1993. In light of the SBA's decision, DOD notified SCITEK on October 7, 1993 that DOD intended to award another Technical Data Support Services contract to SCITEK. DOD decided to stop ordering from SRS and to award a new contract to SCITEK, based on the original RFP that led to the August 26 award to SRS. Also on October 7, 1993, DOD notified SRS that DOD did not intend to exercise additional options or increments of options under the August 26 contract. On October 12, 1993, DOD announced that it was awarding a new contract to SCITEK.

Challenging both the SBA's termination of its SDB status and DOD's awarding of a new contract to another offeror on the same RFP, SRS filed this action. On November 10, 1993, plaintiff won a preliminary injunction

preventing performance of the contract by any offeror other than plaintiff.

On October 27, 1993, defendants filed a motion for dismissal or summary judgment against plaintiff. On November 8, 1993, plaintiff filed a cross-motion for summary judgment, alleging that DOD improperly awarded the contract at issue to a company other than SRS after award had been made to SRS, and that the SBA improperly determined that SRS is not an SDB. In their opposition memorandum and in their original motion for summary judgment, defendants dispute both of these claims. This memorandum opinion addresses each of plaintiff's claims in turn.

## II. INTERVENTION

The unopposed motion of SCITEK, the protestor, to intervene shall be granted. SCITEK shall also be granted leave to file its motion to dismiss or for summary judgment, but because the key arguments of its motion are unpersuasive, its motion shall be denied.

SCITEK's motion argues, first, that this court lacks jurisdiction over this case and that injunctive relief is inappropriate since SRS could sue for damages, and second, that plaintiff lacks standing to bring this case. The first argument is rejected in the jurisdictional section below, and the second argument is rejected in footnote 5 of this opinion.

## III. JURISDICTION

█ This court has jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, to adjudicate these motions. Plaintiff is seeking judicial review of agency actions allegedly in violation of agency regulations, the classic case for APA jurisdiction.

SCITEK, the protestor and intervenor in this case, contests this court's jurisdiction by arguing that this is a contract case, not a case of regulatory interpretation, and that as a contract case it may only be heard in the United States Court of Federal Claims (or its predecessor, the Court of Claims) or the Armed Services Board of Contract Appeals ("ASBCA"). (SCITEK's Motion to Dismiss or for Summary Judgment, at 5 (citing Con-tract Disputes Act of 1978, 41 U.S.C. §§ 601 et seq. (1988) and the Tucker Act, 28 U.S.C. § 1346(a)(2) (1988))).

SCITEK relies heavily on the two-pronged analysis of *Ingersoll–Rand Co. v. United States,* 780 F.2d 74 (D.C.Cir.1985), in its argument that this court lacks jurisdiction. The *Ingersoll–Rand* court held that a district court lacked jurisdiction to hear a contractor's complaint against a governmental decision to terminate its contract and resolicit bids. *Id.* at 74–75. Unlike *Ingersoll–Rand,* however, this case rests on issues of regulatory law, not contract law. Almost all of the elements of *Ingersoll–Rand* are distinguishable from this case.

In the first half of its analysis, the *Ingersoll–Rand* court found that the case before it could be "entirely contained within the terms of the contract," that "the issues raised by plaintiff's complaint are within the unique expertise of the Court of Claims," and that plaintiff was not a frustrated bidder but a contracting party alleging breach. *Id.* at 78–79. These three factors cut against district court jurisdiction.

The present case differs from *Ingersoll–Rand* in all three respects. First, this case could not possibly have been founded on an alleged violation of any contractual provision. In *Ingersoll–Rand,* one of the key points of contention was a regulation that had been incorporated into the contract itself, which meant that the entire cause could have been brought under the contract. Here, by contrast, the issue is whether DOD violated its own regulations (never incorporated into the contract), not whether DOD violated some contractual provision. This case is not founded on any contractual provision at all. DOD is simply taking the contract away from SRS by refusing to place further task orders under it, and is awarding *the same contract* to SCITEK. What makes this DOD action unlawful is not contract law; facially, at least, contract law appears to leave DOD free to do this to SRS, since DOD is not terminating the SRS contract and since there are no guaranteed orders under the contract. SRS does not, and apparently cannot, make a contract claim. SRS's sole available argument that this DOD action is unlawful stems

not from contract law, but from DOD regulation.

Secondly, this case centers on the interpretation of regulations, a skill district courts are particularly well-suited to perform, and not on any specialized or arcane knowledge of government contracts. Significantly, the district court in *Ingersoll–Rand* was called upon to adjudicate close questions of plaintiff's rights under the contract and regulations; in this case, by contrast, this court need only discover whether there was a clear violation of plaintiff's regulatory (not contractual) rights.

Thirdly, in this case SRS does not—indeed cannot—invoke any contractual provision to claim that DOD's decision to refuse to exercise further task orders constitutes breach of contract. No contractual provision guarantees SRS the right to have all task orders exercised, as SCITEK concedes. (SCITEK's Motion to Dismiss or for Summary Judgment, at 8.) The source of SRS's right to have all task orders exercised is a DOD regulation, not any contractual provision. (*See infra.*)

In the second half of its analysis, the *Ingersoll–Rand* court held that a comparison of the remedies afforded by the two jurisdictions was relevant to deciding whether the district court had jurisdiction. In *Ingersoll–Rand,* the court ruled (1) that even though plaintiff could have received only damages, not injunctive relief, in the Claims Court, the Claims Court's remedy was not inadequate, and (2) that plaintiff's request for specific performance "must be resolved by the Claims Court," a forum that did not award that remedy. *Id.* at 79–80.

■ In this case, by contrast, SRS may not receive even monetary relief in the alter-native forums. It is hard to see how SRS could collect damages in the Court of Federal Claims or in the ASBCA since it appears to lack any contractual claim. (SRS appears to lack any contractual claim because, as noted above, DOD is not terminating the SRS contract and SRS is not guaranteed orders under the contract.) Apparently, for plaintiff, it is injunctive relief or nothing.[1]

Further, SRS's request for a permanent injunction is not a request for specific performance. Plaintiff in *Ingersoll–Rand* sought "an order reinstating the original award of the contract," in essence requiring the government to perform. *Id.* at 80. Here, by contrast, the court is merely ordering DOD to cease violating its own regulations in dealing with SRS. Such relief is not the "typical contract remedy" that is properly awarded by specialized courts like the Court of Federal Claims alone. *Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 895 (D.C.Cir. 1985). (Because SRS's additional requested relief—ordering DOD affirmatively to take any actions necessary to allow continued contract performance by SRS—may come perilously close to a request for specific performance, this court refuses to grant it.)

In sum, because this case is fundamentally a dispute about the meaning of regulations, and not about contract law, district court jurisdiction is appropriate.

## IV. AGENCY ACTION OF THE DE-PARTMENT OF DEFENSE

Plaintiff's motion for summary judgment argues persuasively that DOD announced its intention to award a new contract to SCITEK, in violation of DOD's own regulations. Ordinarily, DOD is entitled to a high degree of deference in the interpretation of its own regulations.[2] Yet federal courts must over-

---

1. Incidentally, recognizing that SRS apparently cannot raise a contract claim disposes of an independent argument of SCITEK against injunctive relief. In that independent argument, SCITEK asserts that because SRS has an adequate remedy at law—namely, a contractual claim for monetary relief—this court should not award equitable, injunctive relief. (SCITEK's Motion to Dismiss or for Summary Judgment, at 11.) The problem is that SCITEK's premise is flawed: SRS appears not to have a contractual claim.

2. *See Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984) (judicial review of agency contract decisions is limited to determining whether agency violated applicable regulations and statutes); *Allen M. Campbell Co. Gen. Cons. v. Lloyd Wood Const. Co.,* 446 F.2d 261, 265 (5th Cir.1971) (agency's interpretation of its own regulations accorded great deference). *See also Elcon Enterprises, Inc. v. WMATA,* 977 F.2d 1472, 1478 (D.C.Cir.1992) (in procurement context, only those agency actions that are clear and

turn agency actions that clearly violate the agency's regulations and statutes. *See Shepherd v. Merit Systems Protection Board,* 652 F.2d 1040, 1043 (D.C.Cir.1981). In the present case, DOD acted in clear violation of its regulations in deciding to award this contract to SCITEK, and SRS is thus entitled to a permanent injunction barring defendants from taking any additional steps in furtherance of performance of this contract by any offeror other than SRS.

### A. Section 219.302–70(h)

The key regulation that DOD clearly violated in this case is 48 C.F.R. § 219.302–70(h), which provides as follows (emphasis added):

(h) An SBA determination may be appealed by—

(1) The interested party whose protest has been denied;

(2) The concern whose status was protested; or

(3) The contracting officer.

The appeal must be filed with the SBA's Associate Administrator for Minority Small Business and Capital Ownership Development within five working days after receipt of the determination. *If the contracting officer receives the SBA's decision on the appeal before award, the decision shall apply to the instant acquisition. If the decision is received after award, it will apply to future acquisitions.*

■ Plaintiff argues that the final sentence of § 219.302–70(h)(3) limits the effect of late SBA determinations to "future acquisitions" only. That is, when an SDB determination is rendered late—after the fifteen days that the DOD contracting officer must wait for the SBA to render its final SDB decision, and after the DOD contracting officer has then awarded the contract to an offeror [3]—the late SBA determination has no effect on the already awarded contract. (The SBA's determination will still affect future contract competitions, of course). In the present case, the timing of the SBA's decision to terminate the SDB status of SRS may affect SRS's future entitlement to compete for SDB contracts, but it has no effect on SDB contracts that SRS has already secured, including the one at issue here.[4]

Defendants counter that this reading of the regulation confuses "appeals" with "protests." An "appeal" is an "administrative appeal of the initial SBA determination"; a

---

prejudicial violations of applicable law may be set aside).

3. Under 48 C.F.R. § 219.302–70(g), "[i]f the contracting officer does not receive an SBA determination within 15 working days after SBA's receipt of the protest, the contracting officer shall presume that the challenged offeror is socially and economically disadvantaged."

This fifteen-day waiting period may be extended. Contracting officers may "not use the presumption as a basis for award without first inquiring as to when a determination can be expected and waiting for the determination, unless further delay in award would be disadvantageous to the Government." *Id.*

Since the SBA's initial determination was not made until September 3, 1993, the Army was obliged by this regulation to presume that SRS was socially and economically disadvantaged, and it obviously did so. Under the regulation, the Army had to inquire as to when an SBA determination could be expected and wait for that determination, unless further delay in award would be disadvantageous to the government. The Army apparently decided against further delay, making the award on August 26. A week later, the SBA made its initial determination on September 3 that SRS was not an SDB.

4. Further, in two analogous situations, agency decisions generally apply only to future acquisitions and leave existing contracts unaffected.

For example, SBA decisions about whether an offeror is "small" enough to qualify as a Small Disadvantaged Business are governed by a regulatory scheme very similar to the one that governs economic disadvantage determinations. (FAR 19.302(h) & (i).) In general, these size determinations have been held to apply prospectively. *See, e.g., WillCan Enterprises,* B–224669, 86–2 CPD ¶ 347 (1986) ("a SBA [size protest] ruling on the appeal does not affect the award of a contract if it is received by the contracting officer after award.").

Similarly, debarment—the procedure used to exclude a contractor from government contracting (FAR § 9.403 (1992))—has a generally prospective effect. Although a debarred contractor may not be awarded new contracts from agencies, its existing contracts with agencies continue unaffected. (FAR §§ 9.405(a), 9.405–1.)

Yet this court need not resort to guidance from these comparable regulatory schemes to find a clear violation of DOD regulations. The meaning of the directly applicable DOD regulations are clear enough for this court to determine that the agency violated its own regulations.

"protest" is the initial complaint that a disappointed bidder brings before the SBA. (Defs.' Opp'n to Pl.'s Cross–Motion for Summary Judgment, at 2.) The decision referred to in the final sentence of § 219.302–70(h)(3) is a decision regarding an "appeal," not a decision regarding a "protest." Altering an existing contract based on a late-arriving "appeal" decision is not allowed under § 219.-302–70(h)(3); altering an existing contract based on a late-arriving "protest" decision is not expressly forbidden (or perhaps even expressly covered) by § 219.302–70(h)(3), according to defendants. Therefore, defendants argue, the bar of § 219.302–70(h)(3) does not apply to this case, in which DOD took actions against SRS based on a late-arriving "protest"—not "appeal"—decision.

In this case's chronology, the "protest" decision occurred on September 3, 1993, when the SBA initially ruled—in response to SCITEK's protest—that SRS was not an SDB. The "appeal" decision of this case occurred on September 30, 1993, when the SBA Associate Administrator upheld—in response to SRS's administrative appeal—the September 3 initial determination. Defendants argue that DOD was reacting to the "protest" decision of September 3, not the "appeal" decision of September 30, when it decided to stop placing orders with SRS and to award this contract to SCITEK.

If DOD was in fact reacting to a "protest" decision and not an "appeal" decision, DOD might have an arguable basis that its action did not violate § 219.302–70(h)(3). However, DOD's own actions belie its argument that it was prompted by the September 3 initial determination. DOD did not do anything against SRS after the September 3 determination, giving the September 3 initial decision the minimal credence that DOD apparently believed an initial determination was due. Immediately after the September 30 final SBA determination, by contrast, DOD quickly began taking actions against SRS. On October 7, DOD indicated that it did not intend to exercise additional contract options with SRS, and on October 12, DOD announced the award of a new contract to SRS's competitor, SCITEK.

In short, DOD's actions against SRS appear to have been spurred by the "appeal" decision of September 30, not the "protest" decision of September 3. Section 219.302–70(h)(3) clearly bars DOD from acting on a late "appeals" decision, which is exactly what DOD did here.

### B. Future Acquisitions

■ Further, DOD seems to argue that even if it did act on a late appeal decision, it has complied with § 219.302–70(h)(3) because it has applied the SBA's appeal decision to "future acquisitions" only. § 219.302–70(h)(3). A contract's options or purchase orders, according to defendants, are themselves separate "acquisitions," and § 219.-302–70(h)(3) permits DOD to channel such separate, "future acquisitions" away from a contractor like SRS that the SBA has already determined not to be an SDB. (Def.s' Motion for Summary Judgment, at 13 n. 2.)

In the present case, defendants estimate that the guaranteed part of the August 26 contract is only $77,000. The rest of the contract consists of options, and the DOD contracting officer has "inherent discretion" in deciding whether to exercise an option or not. (Transcript of Hearing on Preliminary Injunction, November 10, 1993, at 32.) DOD refused to issue any more task orders under the August 26 contract and planned to turn over those work orders to SCITEK. (Transcript, at 15.) (This action was barred by this court's preliminary injunction order of November 10, 1993.)

Defendants' interpretation of the term "future acquisitions" could render § 219.302–70(h)(3) meaningless. Defendants' reading of the regulation would allow the government to avoid the strictures of § 219.302–70(h)(3) simply by structuring government contracts as a series of options or purchase orders, giving themselves latitude to subsequently channel the real work of a contract away from the putative winner of the contract bid.

Under § 219.302–70(h)(3), an "acquisition" is a contract, not merely an option or a purchase order of an existing contract. Regulations governing acquisitions frequently equate the term "acquisitions" with the term "contracts." *See, e.g.,* FAR §§ 4.401 (classi-

fied acquisition), 6.003 (sole-source acquisition), 17.101 (multiyear acquisition). Under the SBA regulations, a "[f]ederal contract means an acquisition contract awarded by an agency...." 13 C.F.R. § 146.105(c) (1992).

■ In sum, DOD cannot avoid its commitment to SRS. DOD's own regulations clearly require that once a contract has been awarded, the contracting officer must ignore any untimely determination by the SBA that an offeror was not actually an SDB. DOD did otherwise, to SRS's detriment. Further, DOD may not interpret a troublesome regulation out of existence by defining "acquisitions" as merely purchase orders or options, rather than whole contracts.[5] DOD's actions clearly violate its internal regulations, and SRS in entitled to summary judgment on this claim. DOD shall be permanently enjoined from taking any additional steps in furtherance of performance of the Technical Data Management Support Services requirement by any offeror other than SRS.

## V. AGENCY ACTION OF THE SMALL BUSINESS ADMINISTRATION

Plaintiff makes a less persuasive case that the SBA improperly found that plaintiff's concern is not entitled to SDB status.

On September 3, 1993, the SBA's Director of the Division of Program Certification and Eligibility found that SRS was not an SDB because of Mr. Sandhu's quite substantial personal assets. The SBA Associate Administrator for Minority Small Business and Capital Ownership Development subsequently upheld this determination on September 30, 1993. The SBA calculated that "the total current fair market value of [Mr. Sandhu's] personal assets [is] approximately $4.6 million," (SBA Letter of September 30, 1993, at 2), and based on that information, the SBA

determined that Mr. Sandhu was not economically disadvantaged and his concern not entitled to SDB status.

At issue here are the SBA regulations that state and define the "specific factors" that the SBA may consider in determining whether a person like Mr. Sandhu is economically disadvantaged:

> The specific factors to be considered include, but are not limited to: the individual's personal income for at least the past two years; total fair market value of all *assets; and* the individual's personal *net worth.*

13 C.F.R. § 124.106(a)(2)(i) (emphasis added).

The third of these three "specific factors" is further defined by regulation:

> An individual whose personal net worth exceeds $750,000 as calculated pursuant to paragraph (a)(2)(i) of this section, will not be considered economically disadvantaged . . .

13 C.F.R. § 124.106(b)(2).

Calculations of "personal net worth" are governed by 13 C.F.R. § 124.106(a)(2)(i)(B) (emphasis added):

> Whenever SBA calculates the personal net worth of an individual claiming disadvantaged status ... SBA shall *exclude the individual's ownership interest in the applicant or participating 8(a) concern and the equity in his/her primary personal residence* ...

Plaintiff argues that these regulations require the SBA to find a person to be economically disadvantaged if his net worth—excluding ownership interest in the concern and home equity—is less than $750,000. (Pl.'s Complaint, at ¶ 20.) Mr. Sandhu's personal

---

**5.** Intervenor SCITEK argues that SRS lacks standing to bring this case "[b]ecause all remaining work under SRS' contract is optional [and thus] SRS has no vested right to the work." (SCITEK's Motion to Dismiss or for Summary Judgment, at 10.) Because under DOD regulations, the task orders of SRS's contract are not at all "optional," SCITEK's challenge to standing fails.

SCITEK's second challenge to SRS's standing also fails. SCITEK asserts that non-SDB concerns lack standing to challenge awards of SDB

contracts. (SCITEK's Motion to Dismiss or for Summary Judgment, at 10.) However, none of the cases SCITEK cites for this proposition state that concerns that win contracts and later lose them to an adverse SDB ruling lack standing. Such a holding would deprive standing to the sole parties with a direct economic interest in seeing § 219.302–70(h)(3) enforced. Because SCITEK's argument lacks support in precedent and policy, this court rejects it and finds that SRS indeed has standing.

net worth, excluding ownership interest and home equity, is $96,157. Plaintiff charges that the SBA abused its discretion in finding that Mr. Sandhu was nevertheless not economically disadvantaged.

Yet plaintiff's argument rests on a flawed interpretation of the applicable regulations. To be sure, the fact that net worth (properly calculated to exclude ownership interest and home equity) is below the threshold amount is a factor in favor of finding economic disadvantage. However, it is only one factor among others. Under 13 C.F.R. § 124.-106(a)(2)(i), the SBA may consider not only net worth, but assets, and substantial assets may prove a countervailing factor.

Plaintiff argues, incorrectly, that the definition of the term "assets" must parallel the definition of the term "net worth," *i.e.*, that both terms must exclude ownership interest and home equity. Yet nothing in the regulations indicates that the definitions of "assets" and "net worth" must be the same. Section 124.106(a)(2)(i)(B) expressly defines "net worth" as to exclude ownership interest and home equity, but no such regulatory or statutory provision limits the definition of "assets" this way. In fact, the regulations expressly provide that the SBA may consider the "*total fair market value of all* assets." 13 C.F.R. § 124.106(a)(2)(i) (emphasis added).

█ In applying these regulations to this case, the SBA appropriately acknowledged that Mr. Sandhu's net worth, properly calculated, excludes his ownership interest in SRS. (SBA Letter of September 30, at 1–2.) However, the SBA also appropriately weighed Mr. Sandhu's $4.6 million in total assets as another "specific factor[ ] to be considered" (13 C.F.R. § 124.106(a)(2)(i)), and reasonably concluded that SRS was not entitled to SDB status.[6]

## VI. SECOND MOTION FOR PRELIMINARY INJUNCTION

SRS's motion for a second preliminary injunction shall be denied as moot. This new preliminary injunction motion, filed January 10, 1994, challenges the SBA's decision that SRS is not an SDB for the purposes of another government contract, the so-called "Marshall procurement."

However, SRS concedes that once this court rules on the cross-motions resolved in this memorandum opinion, the relief SRS seeks in its second preliminary injunction motion will not be needed. (Pl.'s Motion for Preliminary Injunction, at ¶ 1.) Accordingly, SRS's motion for a second preliminary injunction shall be denied as moot.

## VII. SUPPLEMENTAL COMPLAINT

SRS's motion for leave to file a supplemental complaint shall be denied. The supplemental complaint argues, among other things, that the SBA wrongly denied SRS's SDB protest against SCITEK.

In light of the relief today afforded SRS on the proposed award to SCITEK, which is now permanently enjoined, it is not clear that SRS will suffer any harm from the SBA determination as to SCITEK. In any event, deciding the issues raised by the supplemental complaint will unreasonably delay disposition of this case. For these reasons, SRS's supplemental complaint must await another day. SRS is free to recast the arguments of its supplemental complaint as a complaint in a new, perhaps related, action before this court.

## VIII. MOTION FOR EXTENSION OF TIME

SRS's motion for an extension of time to file its opposition to defendants' motion to dismiss or for summary judgment is granted,

---

**6.** Plaintiff's challenges to the rationale of early staff analysis of the SRS protest case (Pl.'s Cross–Motion for Summary Judgment, at 2–3) are unpersuasive, since they are directed not to the final SBA decision and reasoning and but to the SBA's preliminary thoughts on the issue.

Similarly weak is plaintiff's argument that the SBA improperly added to the sum of assets both shares and retained earnings that were pledged to secure an SRS line of credit. (Pl.'s Cross–Motion for Summary Judgment, at 3 n. 1.) No matter the use of shares and retained earnings, they are still considered assets.

Significantly, plaintiff does not argue that these or other alleged miscalculations of Mr. Sandhu's assets would substantially reduce the $4.6 million figure.

*nunc pro tunc,* until November 8, 1993. SRS requested that its opposition be due eleven days after this court ruled on SRS's anticipated motion to compel production. SRS withdrew its motion to compel on November 8, 1993, and filed its opposition to defendants' cross-motion that day. Its opposition shall be deemed timely filed.

A separate order shall issue this date.